813 So.2d 1254 (2002)
Sherry NETHERLAND, Plaintiff-Respondent,
v.
ETHICON, INC., Johnson & Johnson, Johnson & Johnson Hospital Services Corp., Johnson & Johnson Health Care Systems, Inc., Owens & Minor, Inc., Defendants-Respondents,
Willis-Knighton Health System, Defendant-Applicant.
No. 35,229-CW.
Court of Appeal of Louisiana, Second Circuit.
April 5, 2002.
*1255 Watson, Blanche, Wilson & Posner, by Peter T. Dazzio, Chris James LeBlanc, Baton Rouge, for Applicant, Willis-Knighton Medical Center.
Baggett, McCall, Burgess & Watson, by Roger G. Burgess, Erin McCall Alley, Lake Charles, for Respondent, Sherry Netherland.
Cook, Yancey, King & Galloway, by Herschel E Richard, Jr., John T. Kalmbach, Shreveport, for Respondents, Ethicon, Inc.; Johnson & Johnson; Johnson & Johnson Health Care, Systems, Inc.; Owens & Minor, Inc.
Before STEWART, GASKINS and CARAWAY, JJ.
CARAWAY, J.
Plaintiff filed this suit claiming products liability on the part of a hospital which utilized defective sutures in surgery performed on the plaintiff. Suit was filed over four years after the surgery. The hospital sought writs from this court concerning the trial court's denial of the peremptory exception of prescription. This court denied the writ application, yet on remand from the Louisiana Supreme Court, we docketed the matter for briefing and oral arguments to review the trial court's ruling. For the reasons stated herein, we vacate the trial court's judgment and remand for a hearing to allow plaintiff to present evidence establishing the doctrine of contra non valentem in defense of the defendant's exception of prescription.

Facts
On December 6, 1995, Sherry Netherland ("Netherland") was admitted to Willis Knighton Medical Center ("WK") by her obstetrician, Dr. Gaylon Daigle, for a caesarian *1256 section delivery. Netherland was discharged on December 9, 1995. No problems were noted during her hospitalization at WK.
On December 14, 1995, Netherland returned to WK's emergency room for wound care, and complained of abdominal pain and drainage at the incision site. Dr. Daigle's notes reveal that no drainage, pus or fluid was present when he palpated the wound, however, he did notice thickening of the skin around the incision. He instructed Netherland to apply hot compresses and to use a prescribed antibiotic.
During the evening of December 14, 1995, Netherland's incision began to drain. She again returned to WK's emergency room. Netherland was admitted to the hospital and administered antibiotics intravenously. Netherland was discharged from WK on December 17, 1995, after receiving treatment with antibiotics and wound cleaning. On December 30, 1995, plaintiff again presented at the WK emergency room where her wound was cleaned and re-packed.
Nevertheless, Netherland's incision site did not heal. Therefore, on January 24, 1996, she underwent a surgical closure of the incision. According to Dr. Michael Schwalke, Netherland's wound remained open and became necrotic because she failed to comply with proper wound management. Netherland was discharged from the hospital two days later and she did not receive subsequent treatment for infection at the incision site.
Netherland filed a complaint with the Louisiana Patients' Compensation Fund ("PCF") on November 8, 1996, against WK and Dr. Daigle. Netherland charged that both the doctor and the hospital failed to meet the appropriate standard of care in conducting her caesarean section and providing medical care. A medical review panel was convened in accordance with Louisiana's Medical Malpractice Act ("MMA"), La. R.S. 40:1299.41, et seq. The review panel unanimously ruled that the evidence did not show that either WK or Dr. Daigle's conduct fell below the standard of care. The review panel wrote:
As to Willis-Knighton Medical Center, the medical records do not support a deviation from the standard of care by the hospital or its employees. In fact, the record reflects proper conduct in that sterile operative technique was documented.
Netherland received a copy of the medical review panel's opinion by certified mail on March 27, 1999. Netherland did not commence a timely malpractice action against WK or Dr. Daigle in district court, as allowed by the MMA, after her receipt of the review panel's opinion.
On August 1, 2000, Netherland filed this suit naming as defendants Ethicon, Inc., Johnson & Johnson, Johnson & Johnson Hospital Services Corporation, Johnson & Johnson Health Care Systems, Inc., Owens & Minor, Inc., Owens & Minor Medical, Inc. (hereafter collectively referred to as "Ethicon") and WK. In her petition, Netherland asserts a products liability claim and complains that the Vicryl sutures used to close her incision site were recalled because of problems with sterilization and contamination. Netherland charged that Ethicon received a letter from the Food and Drug Administration ("FDA") in August 1994, which informed the company that it violated federal safety rules by continuing to ship sutures after the discovery of a malfunction in sterility testing. Moreover, plaintiff alleges that a recall of the sutures was not issued until September 1994, and that prior to the recall, defendants knew that some of the Vicryl sutures were contaminated and that the contaminated sutures could cause infection. Additionally, Netherland accuses Ethicon of instructing *1257 employees to inform physicians and/or inquiring consumers that the risk of adverse effects was very low, when, in fact, such information was false. Finally, in Paragraph 26 of her petition, Netherland asserts that her claim was delayed and prescription tolled, because:
26.
Plaintiffs lack of knowledge regarding the cause of her injuries was due in large part to DEFENDANTS' concealment of material facts regarding the contaminated vicryl sutures. By operation of the aforedescribed acts of DEFENDANTS (acts of both commission and omission) and pursuant to the principles of equitable tolling, all applicable statutes of limitations have been tolled. Based on information and belief, Plaintiff avers that the fraudulent acts of concealment by DEFENDANTS included the intentional concealment and refusal to disclose facts known to DEFENDANTS of the dangers of their product that Plaintiff could not reasonably have learned, known of, or otherwise discovered independently. Plaintiff did not know, or have reason to know, that DEFENDANTS were the cause of her injuries until she became aware of publicity in September of 1999, regarding ETHICON's overall malfeasance in designing, manufacturing, distributing, marketing, and selling its vicryl sutures.
In response to Netherland's petition, WK filed an Exception of Prescription on February 28, 2000. Ethicon joined WK's exceptions. WK argued that Netherland's claim was prescribed on its face, because suit was filed almost five years after her 1995 treatment at WK. The trial court denied the exception of prescription and ruled that the claim was not prescribed, since Netherland filed her claim within one year from her learning about the recall of the Vicryl sutures. WK filed a writ application to this court which was denied on June 7, 2001. WK then filed a writ application to the Louisiana Supreme Court. The supreme court granted WK's writ and remanded the case to this Court for briefing, oral argument and opinion. Netherland v. Eithicon, XXXX-XXXX (La.11/2/01), 800 So.2d 881.
On appeal, WK argues that the MMA includes liability for defective sutures, and as such, Netherland's suit is prescribed under La. R.S. 9:5628 and her failure to timely institute a medical malpractice action after the medical review panel ruling. WK further argues that Netherland's petition was prescribed on its face, that she has the burden of proving that prescription was suspended or interrupted, and that she failed to provide any evidence at the hearing to prove that the doctrine of contra non valentem suspended the running of prescription.

Discussion

I.
WK argues that using the allegedly defective sutures is included within the definition of medical malpractice under the MMA. The trial court relied upon the supreme court's ruling in Sewell v. Doctors Hospital, 600 So.2d 577 (La.1992) and found that the MMA and the prescription statute, La. R.S. 9:5628, did not apply in this case.
Since the MMA applies only to "malpractice," all other tort liability on the part of a qualified health care provider is governed by general tort law. Coleman v. Deno, XXXX-XXXX (La.1/25/02), 813 So.2d 303. Likewise, since the subject of malpractice addressed in the medical malpractice prescription statute closely follows the definition of malpractice in the MMA, claims falling outside the MMA will be governed by the law of prescription applicable to torts in general and, when established *1258 by the plaintiff, the doctrine of contra non valentem.
La. R.S. 40:1299.41(A)(8) defines "malpractice" for purposes of the act:
"Malpractice" means any unintentional tort or any breach of contract based on health care or professional services rendered, or which should have been rendered, by a health care provider, to a patient, including failure to render services timely and the handling of a patient, including loading and unloading of a patient, and also includes all legal responsibility of a health care provider arising from acts or omissions in the training or supervision of health care providers, or from defects in blood, tissue, transplants, drugs and medicines, or from defects in or failures of prosthetic devices, implanted in or used on or in the person of a patient.
In Sewell, the accident was allegedly caused by a defective hospital bed. Reviewing the definition of malpractice under the MMA, the court ruled:
The principal purpose of the Medical Malpractice Act is to limit the liability of health care providers who qualify under the Act by maintaining specified basic malpractice insurance and by contributing a surcharge to the Patients Compensation Fund. As long as a health care provider remains qualified under the Act, the health care provider and his insurer are liable for malpractice only to the extent provided in the Act. La.Rev. Stat. 40:1299.45 A.
The Medical Malpractice Act's limitations on the liability of a health care provider are special legislation in derogation of the rights of tort victims. As such, the coverage of the Act should be strictly construed. These limitations apply only in cases of liability for malpractice as defined in the Act. Any other liability of the health care provider to the patient is not subject to these limitations.
* * *
We do not agree that the Legislature intended that a health care provider's strict liability for defects in hospital furniture is to be included in the scope of the Act limiting liability for malpractice. La.Rev.Stat. 40:1299.41 A(8) distinguishes between the liability of a health care provider for negligent acts or omissions in rendering health care or professional services to a patient and the liability of a health care provider for a defective thing in its custody which causes injury to a patient in the absence of negligence by the provider.
Id.
In Branch v. Willis-Knighton Medical Ctr., 92-3086 (La.4/28/94), 636 So.2d 211, the court examined the language of La. R.S. 9:5628 and similarly ruled that products liability claims for a hospital's use of defective blood in transfusions is not included in that special malpractice prescriptive statute. The court explained:
Most medical malpractice actions are based on the physician's alleged failure to exercise the requisite skill and care. 1 Louisell & Williams, supra § 8.03. In modern times two separate bases, implied contract and tort, have been recognized for the identical duty of exercising due care. Id. Therefore, R.S. 9:5628 in its application to actions "based upon tort, ... contract, or otherwise" evinces a legislative intent to cover every kind of medical malpractice action but does not display an aim to affect suits outside this field. Likewise, the statutory terms, "acts," "omissions" and "neglect" are part of the language of negligence, both generally and as regards medical or professional negligence, Restatement (Second) of Torts §§ 2, 6, 282, 282-Comment *1259 a, 284, 299 A, and are not commonly used in the sphere of strict products liability. Id., § 402 A. "[A]rising out of patient care" is descriptive of an action for damages that results from a physician's failure to exercise the "standard of care" required of him in the treatment of a patient. See, e.g., Meyer v. St. Paul-Mercury Indem. Co., 225 La. 618, 73 So.2d 781, 782 (1953) (A physician is required "to exercise the degree of skill ordinarily employed, under similar circumstances, by the members of his profession in good standing [with] reasonable care and diligence....").
Strict products liability actions, on the other hand, arise out of the sale of a product in a defective condition unreasonably dangerous to the user or consumer and the causation thereby of physical harm to such a person. See, e.g., Restatement (Second) Torts § 402 A. Furthermore, R.S. 9:5628 does not contain terms or concepts indispensable to the definition, classification and administration of strict tort products liability actions, such as "strict liability," "defective condition," "unreasonably dangerous," "normal use," or "user or consumer." Nor does it apply to the most common sellers of medical products, such as drug and medical supply companies.
The background and history of R.S. 9:5628 also reflect that products liability actions do not fall within its ambit. The purpose of the statute is to check the increase in medical malpractice insurance premiums by restricting the volume and retrospective nature of medical malpractice litigation. There is no evidence that the legislature intended by R.S. 9:5628 to curb any type of litigation other than traditional medical malpractice actions.
Id. at 214-215; see also, Williams v. Jackson Parish Hospital, XXXX-XXXX (La.10/16/01), 798 So.2d 921.
In 1999, the legislature added another prescriptive statute which is similar to La. R.S. 9:5628 but which specifically addresses products liability claims arising out of defective blood and tissue used by a healthcare provider. La. R.S. 9:5628.1. While that statute was enacted after Netherland's 1995 operation, we note that the legislative definition of the use of "tissue" as addressed in the new statute applies to "the transplantation or medical use of any human organ, human or approved animal tissue, tissue products or tissue components by any healthcare provider." La. R.S. 9:5628.1(F)(2).
Based upon the above law and jurisprudence, we do not find that the use of the terms "tissue" and "prosthetic devices" in the MMA can be broadly interpreted at this stage of the proceeding to include the defective Vicryl suture. The hearing on the exception of prescription is an evidentiary proceeding. La. C.C.P. art. 931. Nevertheless, at that hearing, WK offered no evidence to show that the Vicryl sutures consist of human or animal tissue. Accordingly, we do not find that plaintiffs claim is covered by the MMA and any issue of prescription pertaining to an MMA claim is not present.
Finally, WK asserts that in the absence of an MMA claim, there is no other basis for a cause of action based upon negligence. WK cites the Louisiana Products Liability Act, La. R.S. 9:2800.51, et seq. ("LPLA"), which imposes no liability on a non-manufacturer seller, like WK. Nevertheless, the enactment of the LPLA in 1988 did not change Louisiana's law regarding the seller's negligence for injuries caused by its defective products when it knew or should have known of the defect. Slaid v. Evergreen Indemnity, Ltd., 32,363 *1260 (La.App.2d Cir.10/27/99), 745 So.2d 793; see also, Thomas C. Galligan, Jr., Contortions Along the Boundary Between Contracts and Torts, 69 Tul.L.Rev. 457, 494 (1994).
In this case, Netherland's petition alleges WK's distribution of the defective product which was presumptively charged to Netherland as an expense of the surgery. Further, the petition alleges that WK "knowingly and negligently distributed contaminated sutures after receiving notice of the recall." We therefore find that a cause of action in negligence has been alleged and that the general tort law pertaining to one-year prescription applies.

II.
Generally, the burden of proving that a suit has prescribed rests with the party pleading prescription. Cruse v. Louisiana State Univ. Medical Ctr., 34,779 (La.App.2d Cir.6/20/01), 792 So.2d 798; Dixon v. Louisiana State Univ. Medical Ctr., 33,036 (La.App.2d Cir.1/26/00), 750 So.2d 408, writ denied, XXXX-XXXX (La.4/20/00), 760 So.2d 350. However, when the plaintiff's petition shows on its face that the prescriptive period has expired, the burden shifts to the plaintiff to demonstrate suspension or interruption of the prescriptive period, due to his lack of knowledge of the tortious act. Cruse, supra; Wilkes v. Carroll, 30,066 (La.App.2d Cir.12/10/97), 704 So.2d 938. The shifting of the burden means that the plaintiff must allege and prove facts indicating that the injury and its causal relationship to the alleged misconduct were not apparent or discoverable until within one year before the suit was filed. Cruse, supra; White v. Willis-Knighton Medical Ctr., 25,575 (La. App.2d Cir.2/23/94), 632 So.2d 1198, writ denied, 94-1024 (La.6/17/94), 638 So.2d 1098.
The one year prescriptive period commences to run on the date that an injured party discovers or should have discovered the facts on which to base a cause of action. Griffin v. Kinberger, 507 So.2d 821 (La.1987); Chandarlis v. Shah, 535 So.2d 895 (La.App. 2d Cir.1988); Dixon, supra. When a party has sufficient information to incite curiosity, to excite attention or to put a reasonably minded person on guard and call for inquiry, he or she has the constructive knowledge necessary to start the running of prescription. White, supra; Dixon, supra.
Summarizing Louisiana's doctrine of contra non valentem, the supreme court has recently stated:
La. C.C. art. 3467 states that "prescription runs against all persons unless exception is established by legislation." In spite of the clear language of La. C.C. art. 3467, the jurisprudential doctrine of contra non valentem remains a viable exception to this rule. Plaquemines Parish Comm. Council v. Delta Dev. Co., 502 So.2d 1034 (La.1987); see also La. C.C. art. 3467, Official Revision comment (d). This Court has recognized four factual situations in which the doctrine of contra non valentem applies so as to prevent the running of liberative prescription:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiff's action;
(2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; or
(4) where the cause of action is neither known nor reasonably knowable by the *1261 plaintiff even though plaintiff's ignorance is not induced by the defendant.
Renfroe v. State, Dept. of Transp. and Dev., XXXX-XXXX (La.2/26/02), 809 So.2d 947.
As quoted above, Netherland's petition alleged that she only became aware of publicity regarding the defective sutures in September 1999. Her assertion of contra non valentem, therefore, is based upon the fourth category of the doctrine listed above. WK urges, nevertheless, that Netherland merely rested on the allegations of her pleadings at the trial of the exception of prescription, and therefore the trial court erred in finding that prescription was suspended by the doctrine of contra non valentem.
We have reviewed the transcript of the hearing on the exception of prescription. From the very beginning of the argument, as counsel for WK announced the fact that almost five years had elapsed between the time of Netherland's surgery and the filing of suit, the trial court asserted and maintained Netherland's opposing view that the contaminated sutures were not discovered by Netherland until September, 1999. Well prepared for the argument, the trial court had thoroughly reviewed WK's submitted evidence consisting of Netherland's deposition taken in December, 1998 at the time of the original medical malpractice proceeding. Yet, the court expressed its view initially in the argument that the deposition showed insufficient knowledge on the part of Netherland allowing her to understand that a product defect, as opposed to other natural causes, had caused the infection of her surgical wound. While we agree with the trial court's view of that evidence, the trial court nevertheless should have required Netherland to present her evidence in support of her claim of contra non valentem instead of simply relying on the allegations of her discovery in September, 1999.
As stated above, the exception of prescription is an evidentiary proceeding. When the plaintiff's claim is prescribed on its face and the plaintiff asserts the doctrine of contra non valentem, the plaintiff is required to prove the facts establishing contra non valentem at the trial of the exception. The mere allegation of those facts, which need not ever be expressed in the petition for purposes of the plaintiff's cause of action (see Dixon, supra), will not serve in defense of the exception of prescription. The plaintiff must prove the case for a suspension of prescription at that early procedural stage.
Nevertheless, in the present case, we find that the trial court erred in expressing a contrary view and reaching an early ruling in the initial argument of the exception, which ruling allowed the mere allegations of Netherland's petition to establish contra non valentem. While Netherland should have insisted on making her proof of her September, 1999 discovery, neither she nor WK should be penalized by the trial court's prejudgment of the issue. Accordingly, with Netherland's claim clearly prescribed on its face, we vacate the ruling of the trial court and remand the case for a continuation of the trial on the exception of prescription at which time Netherland may present evidence concerning her 1999 discovery of the alleged defect in the product. Because of the procedural nature of this ruling, the continuation of the hearing should allow all defendants affected by the trial court's ruling to reurge the exceptions of prescription so that the significant issue of contra non valentem can be properly adjudicated.

Conclusion
The ruling of the trial court is vacated and the matter remanded to the trial court for further proceedings consistent with *1262 this ruling regarding the defendants' exceptions of prescription. Costs of appeal are assessed to applicant and respondent.
VACATED AND REMANDED.